Good morning, Patrick Hennessy, on behalf of Petitioner Mr. Baca. As is pretty clear at this point that there were two claims of error raised by Mr. Baca in the course of the two trials he went through in Riverside County. The first involved ineffective assistance of counsel. The second involved allegations of the prosecution presenting false testimony, not only of the informant, the jailhouse informant, but also the testimony of the Deputy District Attorney, who falsely vouched that he had received no benefit for his testimony against Mr. Baca. Now, the district court ruled against both of these, not because they did not find there was ineffective assistance of counsel, not because they did not find that there was false testimony presented by the people, but because Mr. Baca had been unable to establish prejudice under current standards. The – it's interesting to note that the district court had stated that it would have found for Petitioner, had the district court undertaken a de novo review, for example, had the court of appeal not conducted any prejudice analysis because they may have found there was no ineffective assistance or no misconduct in the presentation of the false testimony. But I think that the important thing here that's noted not only by the district court in the recommendation, but also by the State appellate courts, is the question of the degree of the crime of which Mr. Baca was convicted. He was convicted of two counts of premeditated deliberate murder under the California Penal Code, and there was virtually no evidence that was presented at the second trial that would have provided evidence to support that conclusion other than through Melendez, the informant. So let me be clear on that. So the only evidence concerning this murder-for-hire theory came from the jailhouse informant? The bulk of it, Your Honor. There were bits and pieces, but I think that the – about Tom being cut out of the will. That's correct, yes. There was that. But I think that what the informant testified to and what was of such importance were details about how the crime was committed. There was discussion of a restaurant. There was discussion of the firearm. All of these things that would have suggested that this was a preplanned and premeditated event and that Mr. Baca took part in it. So one thing that I found odd, and it's not really part of any of the arguments, but the prosecutor pursued this case on a murder-for-hire theory. Yes, Your Honor. Meaning that the prosecutor's theory was that Tom hired Baca to murder his father and his father's partner. That's my understanding, that Baca was to share in the proceeds of the inheritance or the insurance policies that Mr. Adair had. This is according to Melendez. This is according to Melendez, and there was other – And it was the government's theory. That was their theory, yes, Your Honor. So the court of appeal drops a footnote saying that Tom was never arrested or prosecuted for his alleged part in the so-called murder-for-hire scheme. That's correct, Your Honor. It's inexplicable to me, at least based on what I know of the case. I wasn't involved in either of the actual trials, but I did handle Mr. Baca's appeals in both cases. And I don't understand it. In fact, I think Tom actually testified at the first trial, and then he was not produced at the second trial by either party. And to my knowledge, to this day, he has not been prosecuted. Because he denied it. He denied the whole theory. That's correct. Yes, Your Honor. That's my understanding. But I think that this was a very troubling case because even the court of appeal noted in their opinion that the issue of prejudice was a, quote, close question. Which standard of prejudice did the court of appeal apply to the NAPU violation? Did it consider the NAPU violation? I don't believe that there was much discussion, to be honest with you, Your Honor, as to the standard that they would have applied. I would assume that given the nature of the violation, but also being a State appellate court, that they probably would have applied the People v. Watson standard in the California Supreme Court, which merely holds that reasonable possibility or more than a reasonable possibility is required to establish that there would have been a different result somehow. It's a lesser standard than Chapman. But did the court of appeal tell us what standard it applied in rejecting the NAPU? I don't know how to pronounce that case. I never have argument. I don't believe they did. Because the only thing I saw in the court of appeal opinion that was directly and explicitly addressed to prejudice was Brady. And they applied the standard for that one. But the court of appeal never mentions NAPU. It may very well have decided a NAPU claim, but it never mentions NAPU. It never mentions the prejudice standard for NAPU. Well, that's correct, Your Honor. That's my recollection, that there was not much of anything, if anything, in discussion. I mean, there was nothing. Now, we can make an inference from the court's statement as to the issue in front of it, but it never refers to the case and it never refers to the standard of prejudice under the case. Well, I would suggest that with that in mind, then I think this Court would be in a position where it could undertake a de novo review because the State court never really ruled on it. That may or may not be right because the Supreme Court is telling us that we must presume, even in the absence of discussion, that the State court applies the proper law as well and the proper standard for applying that law. I mean, that didn't used to be the rule, but that seems now to be the rule. That's — I think that might be correct, but I think it perhaps shouldn't be so ironclad that this Court couldn't take a look at what it was and just simply say they basically did not discuss the appropriate standard as to this particular point in any way, shape, or form. And for that reason, we're not going to infer that they did, because to infer they did means that there was a conscious decision by somebody on the court of appeal, whoever wrote the opinion, and then discussed it with the other justices, that this is what we're thinking, this is the standard that we've applied in rejecting this particular claim. Don't we apply a harmless error standard? Don't we look at it and say they would have come out the same way even if they had explicitly applied the correct standard, assuming they didn't, and we don't know that they didn't, but don't we then also have to presume that they, if they applied the wrong standard, they would have come out the same way, unless it's quite clear that they wouldn't? And here they say they didn't — they say the informant was — I mean, they talk about the fact that the three-year sentence, difference of sentence, wouldn't have made any difference in terms of the witness's credibility, and they also say the evidence — the evidence necessary to challenge the informant's credibility, the informant's sentencing records in prior history, was readily available, and I'm sorry — and any reasonable, competent attorney would have been familiar with that evidence. I'm sorry. There is a — this is the line I was looking for. Lastly, some of the details cited in the informant could only have come from an insider, such as a reference to the Chinese restaurant and the .38 caliber gun. So the court there says, look, whatever is going on is the informant didn't just say the guy confessed to — to murder for hire, he also gave details that only — that only a — only your client would know. What do you make of that? Well, Your Honor, I think that that was an issue at the course of the trial, but also — unfortunately, we can't refer to the first trial because we're dealing with, unfortunately, the result of the second one, but a lot of that information could have been readily obtained from other sources. I mean, the fact that there was a weapon used, the type of — the amount of time that had passed between the trials and the offense itself, a lot of this information would have been out there and could easily have been obtained through other sources, and that's why — So the informant came forward only after the first trial? No, Your Honor. The — he actually testified at the first trial, too, but his sentencing — Okay.  to the informant. So the court of appeals says, look, this is what they determined, so we have to say they're unreasonable in that determination, and they said, whatever the standard is, you know, this informant had information that he only could have gotten from — he couldn't have made up the whole thing because this information he could only have gotten from the defendant. I mean, they're a little not — they're not as clear as they might be in saying that, but that's what I read they were saying. Now, what do you have in response to that? Well, I think what I have is that, first of all, that anything that he would have said, I still believe that there was sufficient time between — even at the first trial, Your Honor, between the time the offense was committed and the time it went to trial was a substantial period of time. If we are going to talk about the first trial, that there were witnesses that were precluded that had said that he lied about how long he was together with Baca. He obviously lied about the fact that he received no benefit, and this lie was, again, expanded upon by the deputy district attorney saying the same thing. But does that — does that language on page 20 of the court of appeals' second opinion really address the false testimony by the prosecutor in the subverting of — subverting of perjury by the prosecutor? I don't believe it does, Your Honor. I don't — I believe it was not adequately addressed by the court of appeal, nor did the court of appeals. No, no, clearly it doesn't, but the question we have to ask is, assuming we infer they applied the wrong standard, it's sort of a harmless error analysis to the court of appeals, and we're not clear that they applied the wrong standard, but assuming they did, don't we also have to look and see whether they would have come out differently had they applied the right standard? And if they've got evidence here that they believe that the informant could only have gotten the defendant, it seems to me it doesn't matter what standard you apply. If that's the case, you would say there's no prejudice. But I think, Your Honor, I understand what Your Honor is saying, but I do think it's also important, and one of the focal points here is the fact that it was established that the informant lied and the deputy district attorney provided a false testimony. So despite the points that you raised about the notations in the court of appeals decision about certain things that the informant allegedly knew, had a jury known that the informant lied, had the jury known that the deputy district attorney vouching for him had lied, they might have been skeptical about the bulk of his testimony and, again, going to the question of what degree this was, which was not really addressed. So what's the remedy, if we agree with you? Do we remand it back to the court of appeal to consider the NAPIU argument? I don't know how to pronounce it either. I would think, well, first of all, obviously, I think Mr. Baca should have a new trial because I still don't think he got a fair trial the second time around. But short of that, then, if this court remanded it back to the court of appeal in Riverside to make a determination as to the NAPIU issue, then I think that would be an appropriate remedy, too. The courts have all uniformly, in the court of appeal and the district court, all believed the prosecutor got on the stand and lied and that it was, you know, I don't know how it was argued below, whether it was argued as outrageous prosecutorial misconduct. I know that NAPIU was raised by the lawyers and not explicitly addressed by the court of appeal. Correct, Your Honor. That was me. Oh, okay. That was you. Well, let me ask you this. How do we remand something to the court of appeal? I thought our power was limited to saying we grant the writ and the state authorities can retry or do X or do Y or release them. I don't think, I mean, do we have authority to send this to, does the court of appeal have jurisdiction to answer our questions? I don't know the answer, Your Honor. How do you approach the courthouse? Do you have to file something in the, how do you get it put on the docket? I simply don't know, to be honest, to answer that question. I mean, obviously, I want to get it back down there. I just think that this issue was not raised. It's a great federal courts question. There you go. Professor Fletcher. I've got a slightly different and a practical question. That's a good question. I don't know. It's a good question. At least we're in agreement on that point. When Baca and Melendez apparently talked together in the jail, were they in the San Bernardino County Jail? Do we know where they were? I believe they were in the jail in Indio, California. It's Riverside County. So he may have been downtown for a while because I think the Indio facility may have been under construction. They were building a new courthouse out there. And by downtown, you mean Riverside? Downtown Riverside. But someplace in the county jail? Yes, Your Honor. We know from the scandals about the informants in the L.A. County Jail that there was a long-time practice of putting would-be snitches in with the others. There's the ability of the snitch to get inside information by various phone calls. I mean, there was a very sophisticated jailhouse snitch set of scams going on in Los Angeles, whereby details of the crime that supposedly would have been known only to the perpetrator, turns out the snitch got them, but not from the perpetrator. Now, whether that's this case, I have zero way of knowing. I know my time is up. But it is worth noting, Your Honor, that you may recall that Mr. Melendez informed on a number of other people in the case that he was originally booked on, which was the homicide. Oh, yeah. No, that's right. He got his 16. As they say, dropped the dime on a number of other people before he passed away. Mr. Baca. No, he did very well by his jailhouse snitching. Thank you. Okay. Thank you. We'll hear from the State. Good morning, Your Honor. May it please the Court. Magistrate Judge Wall said that this case leaves a sour taste in his mouth. It certainly should. A number of things happened that should have not happened, and we're not here to defend them. Do you concede? Let me just start right now. Do you concede that Mr. Spira lied on the stand? I don't. I am not certain that he lied. I think he had some genuine confusion about what happened at the sentencing hearing, because he referred, in his testimony at the evidentiary hearing in the district court, he said there were discussions off the record and on the record. I think he is either correct or firmly believes that there was a misunderstanding among the parties about a change in the law that affected the number of sentence credits that he could get following his conviction for voluntary manslaughter. So you don't concede that he lied? I think it's not clear. But I certainly recognize that Magistrate Judge Wall thinks he lied in the State court. The court of appeals concluded he lied. Do you concede it was false testimony, whether or not he did it intentionally? I don't. As a central matter, I don't think it matters greatly whether Mr. Spira lied or whether he was mistaken. The court of appeal was correct and did not condone the fact that the jury was misled about the circumstances of Mr. Baca's testimony. That is, it was incorrect at the time of Baca's second trial to say that Melendez had never asked for a benefit.  And it was incorrect to say that he never received a benefit, because the trial court made clear that its consideration of the benefit was that he had testified at length. Should we go forward on the assumption that he lied? That's the way I read the court of appeal opinion. The court of appeal, it seems I read that, says that Mr. Spira lied on the stand. Well, they called it fantasy, but I think it's hard to – it's certainly clear that they thought his testimony was inconsistent with the actual facts. Has he been prosecuted for perjury? He hasn't been prosecuted for perjury. And why is that? I don't know the answer to that, Your Honor. You know, it's a little disconcerting when the State puts on evidence, the evidence turns out to be fabricated. Nothing happens to the lawyer and nothing happens to the witness. And so I have to sort of doubt the sincerity of the State when it says this was a big mistake. I would think that if somebody lied on the stand right there in a criminal case, that the first thing that would happen is that there would be a prosecution of the witness, and if the lawyer had any complicity in it, that the lawyer would get disbarred. Has there been any effort in that regard? I don't disagree with your statement that perjury should be prosecuted. I do disagree with the premise that perjury occurred, because as I said, I'm not sure. I think Spiro was confused at his testimony. But the court of appeal basically said it occurred. The State court of appeal. And then analyzed the prejudice. Yes, Your Honor. Although, if I might note one thing, and that is we ---- How about the lawyer? Pardon me? How about the lawyer? Which lawyer? Mr. ---- The prosecutor who put on the ---- Vingrad? Yes. Mr. Vingrad is retired now. And he never was disciplined either for BACA I, where he was severely criticized for the evidence that he put on about BACA's prior conviction, prior child sex conviction. And ---- And why is that? Why was he not disciplined? And what kind of encouragement does that give to young prosecutors? The ---- About dealing with fabricated evidence like this? Your Honor, all I can say about that is this. There is a new district attorney in Riverside this week. I have spoken with my superior in the Department of Justice. And when this matter wraps up, it is our intention to speak with the new district attorney and to make him aware of the severe criticism that came from Magistrate Judge Walls and the criticism mentioning the attorneys by name. What prevents you from doing it now? The criticism from the magistrate judge came a long time ago. You are prevented from bringing that to the attention of the ---- No, Your Honor. Is Spira still with the prosecutor's office in Riverside? Mr. Spira, according to research I've done, became inactive in the practice of law in 2009. So I think he's not practicing law anywhere and certainly not in the district attorney's office. Was there any internal investigation of Mr. Spira or any internal disciplinary proceedings? I think the answer to that question is no. Okay. Well, let's assume that ---- I'll stay away from the word lie. But I think it's consistent with what the court of appeal told us and concluded that Mr. Spira presented false testimony in the second trial knowing that it was false. Yes, Your Honor. That looks like a NAPU claim. Did the court of appeal decide the NAPU claim? Yes, we think so in our brief, but we would agree with this court's observations that that decision was not explicit. That is, we don't have a reasoned opinion on the merits of every element of the NAPU claim. But I think we're required to presume that they decided the NAPU claim, what the Supreme Court of the United States tells us. We think so, Your Honor. In our brief, I think we cited the Johnson v. Williams that said that there's a strong presumption. Can you tell us why the court of appeal rejected the NAPU claim? I think, well, we've argued that part of it might be that there's no indication that Weingart, who was the prosecutor in Baca's case, knew, was aware that there was false testimony. Yes, but Giglio says if it's out of the same prosecutor's office, we impute. Yes. I don't think it matters whether Weingart actually knew or did not. I have my suspicions, but I don't need to act on them because Giglio simply tells me that if it's out of the same prosecutor's office, we impute. I think that's certainly clear with regard to a Brady claim, whether that applies to every conceivable prosecutor misconduct claim. Well, Giglio is a subdivision of a Brady claim. And if it's not clear yet, I am confident it will be clear eventually. Well, for purposes of AEDPA, it needs to be clear now. And as I read Giglio, it is now clear that it's imputed. But you concede they were both out of the same office. Yes, they both were representatives of the district attorney for Riverside County. Okay. So it's the district attorney of Riverside County who made the false statement. Yes. And the magistrate judge has rejected our argument in that regard. So I think so. Okay. So why did the court of appeal reject the NAPU claim? I think because the materiality element of a NAPU claim is very close, not perfectly consistent, I believe, but very close to the same question about prejudice. Well, are you saying that the prejudice analysis in the court of appeal opinion is the reason why they denied the NAPU claim? I think for the same reasons, yes, Your Honor. I want to make sure I ask this question very precisely. They addressed prejudice in the court of appeal. They gave us a standard for why prejudice did or did not exist, and they held under that standard that there was no prejudice. Are you telling me that they rejected the NAPU claim of prejudice based on that standard? Yes, that's what I think, Captain. Well, if that's right, they're wrong, because they recited the Brady standard and the NAPU standard is much less forgiving. That is to say, it's much harder to get around a NAPU violation. I don't disagree that the standards are different, but I think that in the end, without having discussed it and without having expressly applied the standard for NAPU, they determined or that this Court should view their determination as that the materiality standard had not been established. Yes, but that just got fuzzy again. Yes. And I don't dispute that, Your Honor. They didn't address it explicitly. But you're saying they applied the standard that they articulated to the NAPU claim. I'm not saying no. I'm not saying that we should presume they applied the wrong standard. In fact, I would say exactly the opposite. They are presumed to know and apply the law in the absence of evidence to the contrary. But I think the basis is the same. That is, the factors, the factual elements that supported their determination that there was no prejudice under the Strickland standard would be the same factors that would apply. Why don't we say that they applied the wrong standard because they apply only one standard, and then we get to Judge Kaczynski's question about whether that was harmless. The, well, I suppose the question is. I mean, because we're making this up. I realize to some degree the Supreme Court says we need to make step up. But let's say we just take them at their word, and then we get to the harmless error. I guess what I would say is this. If we move to harmlessness, that is, if this Court has concluded that the State Court applied the wrong standard, then their determination, I would have to say, would be seen as an unreasonable application of Supreme Court precedent, and this is under Brecht. And you would ask yourselves de novo and subjectively whether you think it was harmless under the Brecht standard. So the thing that's so troubling about this case is it's the kind of thing that makes you feel that the trial was fundamentally unfair. Right. When you have a prosecutor get up, vouch for a witness who's lying, the course hearing when Melendez's sentence was reduced, you have the judge there saying it's unfair if he doesn't get credit for testifying in the Baca case, because that was the understanding. I mean, it just seems so fundamentally unfair. The, it was improper, and I don't dispute that. I mean, is that the practice of the Riverside County prosecutor, to put on prosecutors who lie? I mean, and then, you know, that's okay because we have this other evidence? I don't think it's proper, Your Honor. And I hope that I made that clear when I began this argument, and I think it's clear that the California courts have not been clear. Don't be assuring that they have taken no steps. I mean, you would think that if they find out about it, court of appeal opinion and the magistrate, you know, they would be up in arms and they would have done something about it to show that this is an aberration. But the total silence on this suggests that this is sort of the way it's done, and they got caught this time, but they're going to keep doing it, because they have state judges who are willing to look the other way. It's not a reassuring picture. Well, Your Honor, I think I would disagree. If you stood there today and said, my God, you know, they have taken these measures. They prosecuted the guy. They have sought discipline. Even the guy who was up higher, they are going to pull his bar card. You know, that would show some sincerity and some suggestion that this is an aberration. But I don't see anything like that. It sounds like this is just the way they do it. My only ñ with regard to condone, that is, the court ñ I inferred one element of your criticism, just criticism, that the courts condone it, and it seems quite clear, at least in this case, that the courts did not condone the prosecutor's conduct. Right, but if you have held ñ no, that's not clear, because they out and out say, this guy, the prosecutor lied on the stand, and his lies bolstered the credibility of a jailhouse niche, but it didn't prejudice the trial. So that's condoning it, because that's saying we're going to ñ and I understand why they do that. I mean, they're elected judges. They're not going to be reversing these things. But it condones it by not reversing the conviction on that basis and making the state do it right without the lies. The ñ the question of whether Mr. Baca is entitled to relief or not is separate, I believe, from the question of whether the prosecutor engaged in misconduct. Of course it is analytically, but in terms of the practical consequences of the decision to go that route. Well, the court ñ the very same court did reverse his conviction based on prosecutor misconduct. Yeah, I know. And then they come back and they do it again. And that's because they thought in that case that the prejudice was not something that could be harmless. And I think that's ñ that's realistic. That is ñ Let me put it in somewhat different terms. You work for the attorney general, right? I do, Your Honor. Okay. An attorney general may prosecute. Correct, Your Honor. Has authority to do that. Correct, Your Honor. Now, is the attorney general aware of the situation? The attorney general is not. My supervisor is. I'm not ñ I'm not interested in ñ there's only one attorney general. Okay. Is the attorney general aware of the situation? I have provided no report to the jury. You will provide this information to her in the next 48 hours? I will, Your Honor. Okay. And she could ñ or somebody in her office could prosecute these cases if she thought that this was a serious matter that was not being handled by the local authorities. There is an authority in California. Absolutely, Your Honor. And ñ Has that happened? Has an investigation been done? Have any steps been taken to show that California does not condone prosecutors getting on the stand and lying to the jury in a criminal case? Anything like that happened? In this case, Your Honor? Yes, in this case. I guess my answer is I suppose other than the criticism from the court of appeal, the answer to that is no. Well, the court of appeal does not work for the attorney general, right? Correct. Okay. So anybody from the attorney general has any ñ is there any idea to prosecutors across the State that if you get on the stand and lie about it and get caught, you are going to have to deal with the attorney general and the possible prosecution for perjury? Well ñ Anything like that? That has not happened, although, as I said earlier, I do not believe that Mr. Kline ñ The reason I have not done it is because I do not believe the proof shows that Mr. Weingrad lied. The court of appeal ñ Have you done an investigation? Have you sent out ñ I mean, normally when you have a crime, you ñ a potential crime, you send out investigators. You talk to people. You take evidence. I have not done that. Have you done that? I have not. You have the authority to do that, do you not? My office does. With the approval of your supervisor. Yes. And she also has prosecutorial discretion. So we could, without question, we have the authority to do those things. Well, I have to say that your office, now under a prior attorney general, but your office fought tooth and nail to keep the 1998 sentencing transcript away from the court of appeal. And if I could address that, Your Honor, I agree that that does not look good. No, it looks terrible. But here is part of the reason why that was not inappropriate in my view. The court of appeal certainly ñ and Mr. Hennessy should be commended because he is the one who fought to bring this all to light as the appellate lawyer. But the court of appeal, when they saw that there was a potential problem, should have ñ should have said there are things here that we need to look at outside the record, the very things that you are talking about in investigation. And consequently, this claim should be raised as a habeas corpus claim. But the problem is, why should the ñ why should Bacchus counsel have had to fight tooth and nail for this information, which was part of a court transcript? But it's clear that Bacchus counsel didn't have to fight for it. He had it from the very beginning. No, no, no. That's not so. The question I address is whether or not the court of appeal gets to see the sentencing transcript and your office bitterly argued that it was not subject to judicial notice and that the court of appeal should not look at the 1998 transcript. They nonetheless look at it, and they also look at the 2002 resentencing, when it was finally read ñ adjusted because of the difference in good time, which is what Silva had been saying happened in 98. And when they look at those two things, they conclude that Silva lied. But I cannot imagine that when the Attorney General's office was trying to keep the 98 transcript away from the court of appeal, that it was doing anything other than trying to keep information that was inculpatory, inculpatory of Mr. Silva, away from the court of appeal. Your Honor. It looks sort of bad. It would look terrible in an opinion when we write it up and name names. Will your name be on there? Were you one of the people that tried to keep it out? I was not, Your Honor. Of the court of appeal? I was not. And who was it that tried to ñ that fought so hard to keep it out? Well, I mean, it's my office, so I am in that ñ in that regard responsible. But it looks like the attorneys who were involved in that were Mr. Delgado-Rucci and ñ The letter is signed by Laura Stilwell Studebaker, whom I do not know. Are they still there? Ms. Studebaker is not Mr. Delgado-Rucci, yes. He currently works with me. Well, you might see his name in an opinion. But is this the kind of thing you really want to press here? Don't you think this is something that you ought to take up with the attorney general and reconsider? Why don't we give you a week to talk to your supervisor and see if you can work out anything with opposing counsel that will avoid having us decide this case? I certainly will accomplish any task that the court directs me to, and we'll report on that. Get a hold of the attorney general. Get a hold of your supervisor and see whether they really want to stick by conviction. This was obtained by lying prosecutors. And that was maintained in the court of appeal after the attorney general's office fought tooth and nail to keep out a transcript that would have shown the perfidy of the prosecutors, and whether having that in Fed Third, documented in Fed Third, is really going to further the interests of justice in California. I will do just that. Do you understand the question? If you do not, there is not only a transcript of this hearing, but we're on video. You can play the video for your boss and the attorney general. And if you would like my memorandum to my supervisor, I'll provide a copy of that to the court so you'll see my description of the circumstances and my reputation for what happens. It's up to you. But you're way over your time. Can I just ask him one question? This really troubles me about this case. It reminds me of Tommy Thompson. The prosecution pursued a theory of murder for hire under the theory that Tom hired Baca, right? That is correct, Your Honor. Well, was Tom ever prosecuted? The answer to that question appears to be no. I can find no record of it, and Magistrate Judge Walsh, as you noted, without citation, he said that there's been no prosecution. There's certainly been no appeal. No, it's murder, so there's no statute of limitations. Is there any plan to prosecute Tom? I don't know if he's even reachable at this point. What do you mean reachable? He received a half million dollars, and so he could be somewhere where there's no extradition treaty. But that's speculation. But Riverside had him at the time. They put him on as a witness in the first trial. They had him at the first trial. That's correct, Your Honor. It's completely inexplicable to me that you would be the principal in this murder for hire thing, unless it was a totally fabricated theory that the jailhouse niche made up, along with the prosecutor. I have no explanation for it. I don't know. Talk to the attorney general, okay? Get her attention. Talk to the attorney general and make sure she understands the gravity of the situation and understand that we take it very seriously. Very seriously. It does not speak well. It does not speak well for the prosecutors in California. It doesn't speak well for the Riverside County DA's office and speaks very poorly for the attorney general's office. I'll make that very clear, although what I would say is I have to use the chain of command, so I won't call the attorney general and speak to her myself. You can find somebody who will get the word to her. I will, Your Honor. Okay. Thank you. Mr. Haney, is there anything further? Thank you, counsel. We will defer submission of this case for a week. If a week is not enough, you can file a motion for additional time. If we don't hear in a week, we will submit the case and decide it. And, Your Honor, I mean, I guess it's not clear to me what you expect to hear from the attorney general. I would expect, you know, if we hear a joint motion from counsel to dismiss the appeal because the State has decided to move in State court to set aside the conviction and retry, Mr. Barker, that would be one resolution. But, you know, you've got opposing counsel. Maybe you can work out something that will pretermine the need for an opinion. Very well, Your Honor. Because I don't think an opinion is something that is going to be very pretty, whichever way it goes. I understand that, Your Honor. Thank you. Okay. Submission is deferred in this case for one week. We will hear the next case on the calendar.
judges: Kozinski, Wardlaw, Fletcher